IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

LINDA K MCCANDLESS,

      Plaintiff,

vs.                                                    CASE NO. 1:10-cv-209-MP-GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals from a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for a period of disability, disability insurance benefits, and supplemental security income.  (Doc. 1.)  The Commissioner has answered (Doc. 9), and both parties have filed briefs outlining their respective positions. (Docs. 11 and 12.)  For the reasons discussed below, the undersigned recommends that the Commissioner's decision be **REVERSED AND REMANDED** pursuant to the fourth sentence of 42 U.S.C. § 405(g) to give proper consideration to the treating physician opinion of Dr. Irfan Nasir.

## I. PROCEDURAL HISTORY

On December 29, 2005, Plaintiff filed applications for a period of disability and disability insurance benefits under Title II, and for supplemental security income under title XVI, claiming disability due to mental depression and hypothyroidism with an onset date of March 4, 2001.  R. 81-88.  Plaintiff's application was denied initially and upon reconsideration. Thereafter, Plaintiff timely pursued her administrative remedies

available before the Commissioner, and requested a hearing before an Administrative

Law Judge ("ALJ").   On April 1, 2009, the ALJ conducted Plaintiff's administrative

hearing.  R. 314-49.   On August 18, 2009, the ALJ issued a decision unfavorable to

Plaintiff. R. 15-23.  Plaintiff timely filed a request for review with the Appeals Council,

which denied her request.  R. 6-8, 11.  On October 25, 2010, Plaintiff filed the instant

appeal to this Court.  Doc. 1.

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against

the Commissioner's decision.[3] The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the decision.[4]

---

[1] See 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past

---

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See Also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[16] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

## III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was 56 years old at the time of the hearing.  R. 322.  Plaintiff has a high school diploma and two years of college coursework toward an associate's degree in environmental science.  Plaintiff testified that she did not complete the degree due to mental health issues and because she obtained work with the state and federal government.  R. 323.   Plaintiff worked as a scientific helper for the USDA from 1995-97.   Plaintiff testified that she was improperly terminated from that employment, and filed a lawsuit.  R. 328-29.  From January 2000 to August 2000, Plaintiff worked as a census crew leader.   She worked in merchandising for a nursery from 2000-2001.  Plaintiff also worked as a graphic designer, motel clerk, and retail clerk.  Plaintiff last

---

[18] Walker at 1003.

[19] Wolfe at 1077-78.

[20] See id.

[21] See Doughty at 1278 n.2.

worked in March 2001.  R. 324-26.

The medical evidence of record reflects the following.  On May 14, 2002, a letter from Pierre Blier, M.D., Ph.D., states that he assessed Plaintiff in connection with a study of new uses for antidepressant medications.  He met with Plaintiff on January 23, 2002, and conducted a psychiatric interview.  He observed that Plaintiff presented with good personal hygiene and was well groomed and appropriately dressed.  Plaintiff made good eye contact, was somewhat fidgety, and obviously oriented in the three spheres.  She did not report hallucinations, delusion, illusions or suicidal ideation.  Her affect was congruent with her depressed mood.  Plaintiff complained of low energy and insomnia.  Dr. Blier noted that Plaintiff had moderately intense anxiety with some physical manifestations.  Plaintiff reported marked decrease in concentration.  Blier concluded "I would consider the signs and symptoms to meet the criteria for major depression with a marked intensity."   Blier also concluded that Plaintiff was ineligible for his study due to mild hypothyroidism, a condition that was corrected with Synthroid.  She was reassessed on May 10, 2002, and found to be only slightly improved with respect to her psychiatric condition.  Plaintiff was prescribed antidepressants that she began taking on May 3, 2002, and was scheduled for follow ups over the next four weeks.  Dr. Blier's final diagnosis was major unipolar depression, hypothyroidism (corrected), and difficulties with economic and social conditions.  Plaintiff's GAF was 55. R. 268-70.

On April 27, 2005, Plaintiff was seen as a new patient at Shands at UF Clinic, Family Practice Medical Group ("Clinic").  Plaintiff related a history of depression stemming from a 1998 job termination.  Other past medical history included

6

hypothyroidism and hyperlipidemia.  Plaintiff was prescribed Lexapro and scheduled for follow up.  The Clinic notes reflect that she was seen by Dr. Irfan Nasir, M.D., who discussed Plaintiff's case with attending physician Dr. Karen Hall, M.D.  R. 190-92.

On July 6, 2005, Dr. Nasir noted Plaintiff's history of depression and her medication, which had been changed to Paxil, was increased.  The notes reflect that "[h]er demeanor in today's visit was improved from last clinic visit."  R. 188.  Dr. Nasir reviewed Plaintiff's case with attending physician Dr. Linda Hensley, M.D.

On August 18, 2005, Dr. Nasir's Clinic notes reflect that Plaintiff reported that her symptoms were better, but the progress was very slow.  Plaintiff was continued on Paxil and medication for hypothyroidism, and was treated for a rash consistent with hypothyroidism.  Dr. Nasir reviewed Plaintiff's case with attending physician Dr. Ken Grauer, M.D.  R. 186-87.

On December 13, 2005, Dr. Nasir's Clinic notes state that Plaintiff was referred for counseling for her depression.  Dr. Nasir observed that "[t]he patient is on Lexapro and is doing quite well."  Dr. Nasir reviewed Plaintiff's case with attending physician Dr. Louis Kuritzky, M.D.  R. 182.

Plaintiff returned to the clinic on  February 2, 2006, with complaints of wrist pain as the result of a fall, and diarrhea.  Dr. Nasir's clinic notes reflect that Plaintiff has depression and that she "is on Paxil and is quite stable on this medication."  Dr. Nasir reviewed Plaintiff's case with attending physician Dr. Robert L. Hatch.  R. 170.

A Treating Source Mental Health Report was completed on February 6, 2006.  R. 180.  This document appears to be a form generated by the Florida Department of Health, Division of Disability Determinations, in connection with a claim by Plaintiff for

benefits.  The form identifies the "Examiner" for Plaintiff's case as "C.B. Hatcher."   The

form was completed by a Family Practice physician, but the physician's signature is

illegible. [22]  The report reflects that Plaintiff's current mental status was "depression -

Zung scale of 66."  It also reflects that concentration is decreased due to depressed

mood, but orientation is normal, memory intact, there are no hallucinations, her

coordination is intact, and she is generally well-kempt.  The report reflects that Plaintiff

is able to manage her funds.  Plaintiff's prognosis is "fair."   The preparer of this report

opined that Plaintiff could perform part-time work as soon as her depression was

treated appropriately, but that she was not capable of sustaining work activity for eight

hours a day, five days a week, due to depression with impaired concentration.  The

report also reflects "poorly treated" hypothyroidism.  R. 180-81.

On May 30, 2006, Dr. Nasir's Clinic notes reflect that Plaintiff was stable on Paxil

and doing well.  The notes describe Plaintiff as "extremely pleasant," and as "[a]

pleasant-appearing female who is cooperative during interview."   Dr. Nasir reviewed

Plaintiff's case with attending physician Dr. Kendall Campbell.  R. 163.  Dr. Nasir

treated Plaintiff in connection with a fall in her home and lab work in June - August

2006; he reviewed Plaintiff's case with attending physicians Dr. David Feller and Dr.

David Quillen.  R. 160-62.

Plaintiff visited the Clinic on September 12, 2006, with a primary complaint

regarding a mass in her right breast that was found on ultrasound.  Plaintiff reported

---

[22]The ALJ attributes this report to "Dr. C.B. Hatcher."  The report reflects that C.B. Hatcher was
the State "examiner", but there is nothing in the record that reflects a Dr. Hatcher as a treating source.  It
appears instead that the form was completed by one of Plaintiff's treating physicians at the Family
Practice Clinic.

that she was doing well in other respects, "[o]ther than her depression and anxiety being somewhat unfavorable."  Dr. Nasir's assessment and plan indicate that other medications may be prescribed for her depression.  He reviewed Plaintiff's case with Dr. Kendall Campbell.  R. 158.

On September 26, 2006, Plaintiff visited the clinic for follow-up of lab results, and reported that "she is having persistent symptoms of depression."  Further tests were recommended with respect to abnormal liver function tests, and her hypothyroid medication was reduced, but no other notes were made regarding her depression.  Dr. Nasir reviewed Plaintiff's case with Dr. Louis Kuritzky.  R. 157.

Plaintiff visited the Clinic on October 18, 2006, and Dr. Nasir's notes reflect that "[s]he continues to have persistent depression and has anhedonia.  She also has difficulty dealing with social situations as well.  She current [sic] continues to have stress secondary to a lawsuit that she has had."  Plaintiff was described as a "pleasant-appearing lady."   The Assessment and Plan noted a history of PTSD, and concluded that Plaintiff should be changed from Paxil to another medication (Bupropion).  Dr. Nasir reviewed Plaintiff's case with attending physician Dr. Karen Hall.  R. 156.

On November 16, 2006, Plaintiff visited the Clinic for follow-up of a breast MRI.  Plaintiff reported that her depression was doing better.  Dr. Nasir's notes state that she had been prescribed Wellbutrin "and that actually made a positive effect on the patient."  Plaintiff was again described as a "pleasant-appearing lady."  Dr. Nasir reviewed Plaintiff's case with attending physician Dr. George Samraj.  R. 148.  At a follow up visit on December 15, 2006, Plaintiff reported that she was doing well on the prescribed dosage of Wellbutrin, and that she was "in good spirits."  Dr. Nasir reviewed Plaintiff's

case with attending physician Dr. David Quillen.  R. 146-47.

On January 5, 2007, Plaintiff presented to the Clinic for follow up and was described by Dr. Nasir as "extremely pleasant."  Plaintiff reported that she was in a stressful situation due to a pending lawsuit, and stated that the Wellbutrin was not helping her much.  Plaintiff was changed back to Paxil.  Dr. Nasir reviewed Plaintiff's case with attending physician Dr. Karen Hall.  R. 144.

On February 19, 2007, Plaintiff returned to the Clinic and described continued depression.  Dr. Nasir's notes reflect that her "Zung Rating Depression scale today is 50 and she reports that she is not enjoying her life. She also has had 2 to 3 panic attacks as well. She is undergoing a lawsuit right now, which she has filed against a government agency, which is quite stressful for her."   Plaintiff was continued on Paxil and prescribed Klonopin for anxiety attacks.  Dr. Nasir reviewed Plaintiff's case with attending physician Dr. David Feller.  R. 142.

On March 7, 2007, Dr. Nasir's Clinic notes reflect that Plaintiff had a "history of severe anxiety due to acute social situation," but reported that she had been doing well. Plaintiff reported that Klonopin had helped her significantly and she otherwise reported no problems.  She was continued on Paxil and Klonopin.  Dr. Nasir reviewed Plaintiff's case with attending physician Dr. George Samraj.  R. 141.

On April 20, 2007, Plaintiff was seen at the Clinic by Dr. John D. Ibrahim for a follow up for treatment for a fall and injury to her forehead.  Plaintiff reported stress stemming from an ongoing lawsuit, and was referred to the stress clinic and scheduled for follow-up with Dr. Nasir.  R. 137.

On April 23, 2007, Plaintiff visited the Clinic to get a medical statement for her

trial to document depression and anxiety.  Dr. Nasir's notes reflect that she "is doing

well on her current medications.  She is under a lot of stress at this time."  Dr. Nasir

reviewed Plaintiff's case with attending physician Dr. Crystal Comeau.  R. 136.

On May 1, 2007, Plaintiff visited the Clinic for a follow up.  Dr. Nasir described

her as "pleasant-appearing," and the notes reflect that she was doing well on her

current regimen of klonopin and paxil.  Dr. Nasir reviewed Plaintiff's case with attending

physician Dr. David Quillen.  R. 134.

Dr. Nasir completed a Treating Source Mental Health Report on July 2, 2007.  R.

195-96.  This document also appears to be a form generated by the Florida Department

of Health, Division of Disability Determinations, in connection with a claim by Plaintiff for

benefits.  The form identifies the "Examiner" for Plaintiff's case as "K. Monahan."   The

report reflects that Plaintiff's mood and affect were anxious and tearful, her thought

process was normal, she did not experience delusions, unrealistic thinking, or

suicidal/homicidal thinking, her concentration was somewhat decreased, she had

normal orientation and memory, and no hallucinations.  Dr. Nasir described Plaintiff as

"well kempt, very anxious, depressed.  Frequent weeping/crying during exam."  His

diagnosis and prognosis was "(1) severe generalized anxiety.  (2) Depression.  (3)

Hypothyroidism.  Prognosis: Good."  Although Dr. Nasir's entries are somewhat difficult

to read, it appears that he responded "no" to the question whether Plaintiff could sustain

work activity for eight hours a day, five days a week, due to "severe

anxiety/depression."  *Id*.

Consulting physician Dr. Nicolas Bancks completed a physical RFC assessment

on May 25, 2007.  Dr. Bancks noted no exertional limitations, and the only postural

11

limitations noted were that Plaintiff could only "occasionally" climb a ladder/rope/scafford, or balance.  There were no manipulative, visual, or communicative limitations.  The only environmental limitations were to avoid concentrated exposure to extreme cold, heat, and hazards.  R. 172-79.

Consulting physician Dr. James H. Hall completed a physical RFC on September 11, 2008.  R. 215-22.  Dr. Hall noted no exertional, postural, manipulative, visual, communicative, or environmental limitations.  Dr. Hall concluded that Plaintiff had no severe physical impairments.

There are two psychiatric review technique forms and mental RFC's which were completed by non-examining state agency physicians.  Dr. Angeles Alvarez-Mullin performed a review on July 12, 2007.  R. 197-210.  Alvarez-Mullin found that Plaintiff's depressive disorder (NOS) and generalized anxiety disorder resulted in only mild or moderate limitations.  Alvarez-Mullin concluded that Plaintiff is "capable of performing, at lease, simple tasks.  May experience [occasional] episodes of decreased attention/concentration.  Able to follow a work routine without special supervision.  Would be capable of making simple work related decisions.  May prefer to isolate but would be able to relate appropriately to supervisors and others on a limited basis."  R. 213.

The second assessment was prepared by Dr. Brenda Sawyer on September 14, 2008.  R. 223-40.  Dr. Sawyer also found that Plaintiff's depressive disorder (NOS) and anxiety disorder (NOS) resulted in only mild or moderate limitations. Dr. Sawyer concluded that Plaintiff "is of, at least, average intelligence.  Memory is described as intact.  Depression likely limits memory to non-complex tasks.  Claimant is able to

12

attend to, and persist at, non-complex tasks over the course of a normal work-day, work week.  Claimant has adequate social skills to interact with supervisors and co-workers. She avoids being in public but is able to complete tasks outside of home.  Avoid work in public and/or crowded spaces.  Contact with public is limited to brief.  Claimant requires a routine with few day to day changes.  She can travel independently and avoid common hazards."

At the hearing, R. 314-49, Plaintiff testified that she drives infrequently, only twice a month.  She stated that she does not trust anyone, cannot go anywhere, and is reclusive.  She testified that she has anxiety about leaving her house, has no motivation or concentration, and cannot do anything she wants to do on a regular basis.  Plaintiff testified that her symptoms began when she was fired from her job in June 1997.  Her alleged onset date of March 4, 2001, is based on an incident that occurred when she was working as a plant merchandiser and a supervisor at Lowe's store commented on her underwear.  Her supervisor for the merchandising company had unrealistic expectations with regard to her schedule, and refused to pay her mileage even though she had to travel long distances to various retail stores.  She believes her boss discriminated against her in comparison with male employees, and then fired her. Plaintiff stated that she got along with her supervisor superficially, and that she was cordial and nice to him.  Plaintiff testified that she tried to find a job in entomology, which she enjoys, but was unsuccessful.

With regard to activities of daily living, Plaintiff testified that she lives alone in a house, does her own cooking, and rarely cleans.  She stated that she is not motivated to clean.  Plaintiff sometimes does not eat two or three times a week.  She testified that

she is "sometimes" able to take care of her personal hygiene needs.  Plaintiff spends a

typical day by getting up, feeding her dog and a chicken, having coffee, and sitting in

front of the television.  She sometimes takes the dog for short walks, and often sits and

stares out the window.  Plaintiff has a computer that she can use, but she uses it

infrequently.

Plaintiff testified that she feels worthless and hopeless, and that her depression

intensified when the Government delated her trial and put her through "countless

depositions and trials," which were not yet over.

Vocational Expert David Pigue testified that Plaintiff's past work could be

classified as follows: Displayer of Merchandise, a skilled job with a medium exertional

level; Scientific helper, a skilled job with a medium exertional level; Survey

Worker/Census Enumerator, an unskilled job with a light exertional level; Graphic

Designer, a skilled job with a sedentary exertional level; Hotel Clerk, a semi-skilled job

with a light exertional level; and Sales Clerk, a semi-skilled job with a light exertional

level.

The ALJ asked he VE to assume an individual with Plaintiff's education and past

relevant work, who could complete simple routine repetitive tasks, occasionally climb

and balance, and should avoid extreme cold, heat, and hazards.  The VE testified that

such an individual could perform unskilled work, and that Plaintiff's past work as a

survey worker would fall within the parameters of they hypothetical.  He testified that

other jobs the individual could perform included hand packager, an unskilled job with a

medium exertional level for which there are 25,479 jobs in Florida.

The ALJ added the restriction that the individual could relate to supervisors and

others on a limited basis.  The VE testified that such a restriction would not preclude the identified jobs of survey worker and hand packager.

In his review of the record, including Plaintiff's testimony and the medical records, the ALJ determined that Plaintiff suffered from the severe impairments of depression, anxiety, and hypothyroidism, but that she does not have an impairment or combination of impairments that meets or equals the listings.  The ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels, but with the limitations of occasional balancing and climbing, avoiding extreme heat or cold, performing simple routine repetitive tasks, with few day to day changes, and relating to supervisors and others on a limited basis.  R. 15-23.

In making these findings, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statement's concerning the intensity, persistence, and limiting effects of her symptoms were not wholly credible.  In particular, the ALJ found that Plaintiff's hearing testimony was at odds with other statements in the record that she maintains her personal hygiene, which is consistent with her physicians' descriptions of her as pleasant and well-kempt.

The ALJ discounted the February 6, 2006, Treating Source Mental Health Report which the ALJ identified as having been prepared by "Dr. C.B. Hatcher," in which the preparer of the report concluded that Plaintiff could not sustain work activity due to depression with impaired concentration and poorly-treated hypothyroidism.  The ALJ explained that although "Dr. Hatcher" was a family practitioner who had the benefit of personally evaluating Plaintiff, "Dr. Hatcher did not have access to all of the evidence

which is currently before the undersigned [ALJ] . . . although the undersigned considered this opinion, *the medical records form the treating physicians at Shands Hospital were not only more recent but showed that with the exception of depression and decreased concentration, the claimant's coordination is intact, thoughts are normal and orientation is normal . . . [t]herefore they were given more weight."* R. 21 (emphasis added).

The ALJ also discounted Dr. Blier's opinion that Plaintiff met the criteria for major depression with marked intensity and a GAF of 55, which indicated moderate symptoms, because this opinion was inconsistent wiht the medical evidence as a whole, which indicated that Plaintiff does well when she adheres to her medication regimen.  The ALJ afforded great weight to the opinions of the consulting agency physicians, because their opinions were consistent with the medical evidence of record.

The ALJ did not discuss the July 2, 2007, Treating Source Mental Health Report prepared by Dr. Nasir, in which Dr. Nasir appears to conclude that Plaintiff cannot sustain work activity for eight hours a day, five days a week.  *See* R. 15-23.

The ALJ found that Plaintiff could perform her past relevant work as a Survey Worker, which did not require the performance of work-related activities precluded by her RFC.  Although Plaintiff could not perform other past relevant work, other jobs also existed in the national economy that she could perform given her documented limitations, such as Hand Packager.  Thus, the ALJ found that Plaintiff was not disabled.

## IV.  DISCUSSION

Plaintiff makes two arguments in opposition to the Commissioner's decision.

16

First, Plaintiff contends that the ALJ failed to properly assess Plaintiff's mental RFC. Plaintiff alleges that the ALJ failed to determine Plaintiff's mental RFC or adopt the mental RFC of the State agency doctors.  Plaintiff argues that the ALJ failed to account for the consulting Agency physician's findings that Plaintiff had a moderate inability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal work day and workweek without interruption from psychologically based symptoms, to interact appropriately with the general public, and to respond appropriately to changes in the work setting. Plaintiff points out that treating physician Dr. Nasir concluded on July 2, 2007, that Plaintiff was not capable of working because of her severe anxiety and depression.   Second, Plaintiff contends that the hypothetical posed to the VE was flawed due to the ALJ's errors in accounting for all of Plaintiff's limitations.

Plaintiff's argument that the ALJ failed to include the limitations identified by the consulting agency physicians is contradicted by the record.  As summarized above, the ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels, but with the limitations of occasional balancing and climbing, avoiding extreme heat or cold, performing simple routine repetitive tasks, with few day to day changes, and relating to supervisors and others on a limited basis.  R. 15-23.  The nonexertional limitations incorporated into the ALJ's RFC account for the agency physicians' findings that Plaintiff has some moderate mental restrictions stemming from depression and anxiety.

However, upon a review of the ALJ's decision, as well as an examination of the medical records as a whole, the Court is persuaded that the ALJ did not properly

17

consider the opinion of Plaintiff's treating physician, Dr. Nasir.  It is well-established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[23]  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[24]

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.[25]  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[26]

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the

---

[23] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records.").  See also Edwards v. Sullivan, 937 F.2d 580, 583-584 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[24] 20 C.F.R. § 404.1527(d)(2).

[25] Edwards, 937 F.2d at 584 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

[26] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record a whole; (5) specialization in the medical issues at issue; and (6) other factors which tend to support or contradict the opinion.[27]  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.[28]

In this case, the ALJ made two errors with respect to the opinions of Plaintiff's treating physicians.  First, the ALJ identified the February 6, 2006, Treating Source Mental Health Report as having been prepared by "Dr. C. B. Hatcher."  There is nothing in Plaintiff's medical records that reflects she was ever treated by a Dr. C. B. Hatcher. Based upon a comparison of the February 6, 2006, Report with the July 2, 2007, Report, it appears that the persons identified as the "Examiner" on the forms – "C.B. Hatcher" and "K. Monahan", respectively – are case reviewers with the Florida Division of Disability Determinations, and not physicians.  The record as a whole supports a conclusion that the physician who prepared the February 6, 2006, Report was a treating physician from the Family Practice Clinic, although the identity of the physician cannot be determined from the form.

The second error made by the ALJ was in discounting the treating physician's opinion expressed on the February 6, 2006, Report regarding Plaintiff's inability to sustain full-time work activity.  The ALJ found that the opinion was not entitled to controlling weight because more recent records from Plaintiff's treating physicians at UF

---

[27] 20 C.F.R. § 404.1527(d).

[28] Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); see also 20 C.F.R. § 404.1527(d)(2).

Shands were inconsistent with that opinion.  This rationale is flawed because the

February 6, 2006, Report *was* prepared by a treating physician at UF Shands.

Moreover, the ALJ wholly failed to mention Dr. Nasir's July 2, 2007, Report and opinion

that Plaintiff could not sustain full-time work activity, which plainly was prepared with the

benefit of all of Plaintiff's recent records, inasmuch as Dr. Nasir created almost all of the

progress notes contained in Plaintiff's records from the Clinic.

       This opinion by Dr. Nasir is entitled to substantial or considerable weight, absent

a showing of good cause to the contrary, and the opinion expressed – if accepted –

would plainly alter Plaintiff's RFC.  The record in this case may provide good cause for

discounting Dr. Nasir's opinion, but that is not a determination for this Court to make in

the first instance. This court's review is limited to determining whether the ALJ's

decision is based upon substantial evidence and whether the ALJ properly applied the

law. The process of reevaluating Dr. Nasir's opinion and determining the weight to be

afforded to his opinion in light of the other evidence of record –  including Dr. Nasir's

own progress notes -- is not a matter for this court to determine but rather a

determination to be made by the ALJ as fact finder.  This approach is consistent with

the Supreme Court's observation in INS v. Ventura that a court reviewing the decision

of an administrative agency may not "'conduct a *de novo* inquiry into the matter being

reviewed and reach its own conclusions based on such an inquiry'" but that "'the proper

course, except in rare circumstances, is to remand to the agency for additional

investigation or explanation.'"[29]

---

[29] INS v. Ventura, 537 U.S. 12, 16 (2002)(quoting Florida Power & Light Co. v. Lorion, 470 U.S.
729, 744 (1985) and SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)).

Absent any explanation as to why the ALJ disregarded Dr. Nasir's opinion, the ALJ's decision fails to provide the Court with sufficient reasoning to determine that the ALJ properly applied the law governing the weight afforded to such opinions.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED AND REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g) to perform the appropriate analysis of the treating physician's opinion of Dr. Irfan Nasir and to conduct such further proceedings as deemed appropriate.

**IN CHAMBERS** in Gainesville, Florida, on December 20, 2011.

*s / Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

21